***********
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Rideout and the briefs and oral arguments before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award, except for minor modifications. Accordingly, the Full Commission affirms the Opinion and Award of Deputy Commissioner Rideout with minor modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered by the parties as:
 STIPULATIONS *Page 2 
1. All parties are properly before the Industrial Commission, and the Industrial Commission has jurisdiction over this matter.
2. All parties are subject to and bound by the North Carolina Workers' Compensation Act.
3. All parties have been properly designated, and there is no question as to joinder or non-joinder of parties.
4. An employment relationship existed between the plaintiff and the employer-defendants during all relevant times.
5. Plaintiff's place of employment was McKinney, Texas, at Honda Cars of McKinney. Hedrick Automotive Group, whose principal place of business is Charlotte, NC, is the majority partner in Honda Cars of McKinney. Hendrick Automotive Group provided certain management services including providing workers' compensation insurance.
6. Plaintiff sustained injuries while in Charlotte on April 19, 2005, after leaving a dinner with other employees of defendant-employer.
7. Plaintiff's average weekly wage at the time of her injury by accident was $2,400.54, which yields a compensation rate of $1,600.37. The maximum workers' compensation rate for 2005 was $704.00.
 *********** ISSUES
The issues before the Commission are:
1. Whether plaintiff suffered a compensable injury by accident arising out of and in the course of her employment on April 19, 2005?
2. If so, what compensation is owed to plaintiff as a result of the injury? *Page 3 
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was 48 years old at the time of the hearing before the Deputy Commissioner. Plaintiff had a degree in accounting and was employed by Honda Cars of McKinney in McKinney, Texas, as the office manager for 11 years.
2. As the office manager, plaintiff worked 10 or 11 hour days, five days per week. She never took sick leave prior to her accident and typically took only one or two days of vacation per year.
3. Plaintiff's job description included the main function of overseeing administrative and financial activities of the dealership. She was responsible for accounting, bookkeeping and general office procedures. She was also responsible for the supervision of the office staff, meetings, budgeting, and training.
4. Plaintiff did not receive formal performance appraisals prior to April 2005. She was rarely absent from work, and received a trip to Atlantis as an award in 2002. Audits were performed in order of the dealership's financial status every 12 to 18 months. While the audit results were not perfect, plaintiff worked hard to correct errors and to keep improving. Plaintiff was consistently below budget and was highly compensated by a monthly salary and a monthly bonus of a percentage of the net income for the dealership. The McKinney location was one of defendant-employer's more profitable dealerships.
5. Over her 11-year employment history, plaintiff had made two key mistakes: she overpaid herself because she was told to use the prior office manager's pay sheet, and she also *Page 4 
treated some non-exempt employees as exempt for salary purposes. Plaintiff later repaid the dealership for part of her salary overpayment. Plaintiff received no written reprimands for her actions.
6. Plaintiff regularly attended annual or biannual meetings in Charlotte, North Carolina, that defendant-employer conducted for training and awards purposes. Plaintiff was required to travel to these meetings. Plaintiff had no other business travel outside of McKinney, Texas.
7. Plaintiff travelled to Charlotte, North Carolina for the April 17 — April 20, 2005 meeting held in Charlotte, North Carolina with two other managers from McKinney. Travel expenses and all other expenses were paid for by defendant-employer, and plaintiff stayed at the Westin Charlotte where accommodations were arranged for the out of town managers and team members. Four hundred and sixty (460) attendees came to the training and recognition conference, including general managers, office managers, dealership department managers and staff, and various corporate staff members.
8. Plaintiff was required to attend specific workshops and meetings organized by defendant-employer. The workshop topics included general sessions with general managers and office managers together, or meetings solely with other office managers and controllers. Scheduled activities were held at the Westin, the Charlotte Convention Center, and a dinner at a restaurant, Bentley's on 27, at 6:00 p.m. on the evening of April 19, 2009.
9. On April 19, the attendees were directed to assemble for a group picture of Hendrick Automotive Team members. The group of office managers, controllers and others walked from the Westin to the restaurant at around 6:00 p.m. Alcoholic drinks were provided by *Page 5 
defendant-employer in the bar area prior to dinner, and plaintiff shared a couple of drinks with other employees.
10. Dinner at the restaurant was solely for members of the defendant-employer's team attending the conference and was held in a private room. The atmosphere was jovial and fun; team members laughed, ate and drank alcohol, all at the expense of the defendant-employer. Plaintiff sat with coworkers Shari Hair and Joe Brewer and others at her table. Plaintiff and others had wine at dinner in addition to the pre-dinner cocktails. In keeping with the atmosphere of the dinner, plaintiff and Ms. Hair hugged people who were leaving, eventually starting a hug line.
11. Following dinner, Shari Hair and plaintiff walked into the bar area. Plaintiff ordered a drink and, following a sip, told people that she was ready to go back to the hotel. The group of managers in the bar prepared to leave for the hotel. The Westin was a 10 minute walk from the restaurant, and the managers headed back as a group. Plaintiff felt as if she had been drinking but that she was not drunk. All of the alcohol, including the post dinner drinks at the bar, was provided by defendant-employer.
12. Although plaintiff has no specific memory of the events that transpired immediately following the group's departure from the bar, another manager from Charlotte, Matt Milroth, established that the group walked towards the escalator in order to return to the Westin. The group was loud and jovial, whooping and hollering, and having a good time as they left. Mr. Milroth saw plaintiff put her leg over the side of the escalator and ride it down briefly. Although plaintiff was on the escalator railing for at most a couple of seconds, she hit a pillar and fell to the tile floor approximately 25-30 feet below. None of the other managers saw the accident. *Page 6 
13. The incident occurred so quickly that Mr. Milroth did not have time to react or even to speak to tell Ms. Evans that she was about to hit the pillar. Members of the group frantically ran damn the escalator and called 911. The incident occurred at approximately 10:16 p.m. Plaintiff was taken by ambulance to Carolinas Medical Center.
14. Plaintiff was treated in the emergency department for multiple traumas, including head trauma, which caused a possible loss of consciousness and some confusion. Plaintiff was admitted to the hospital and underwent multiple surgeries during the period between April 20 and April 26. Plaintiff suffered multiple fractures of her bilateral maxillary sinuses, her bilateral orbits, including a depressed fracture, and three complex facial lacerations. The lacerations included cuts which went through the full thickness of the skin that were repaired by plastic surgery on April 20. Several of her teeth were broken in the front, back and side. Her nasal fracture required fixation on April 25.
15. Because of the enlarging left epidural hematoma and left frontal contusion, plaintiff underwent a left frontal craniotomy to remove blood from the brain on April 22. Her skull had been fractured, and the repair was accomplished by the use of steel plating. Plaintiff's wrist was repaired by a closed reduction with internal fixation of the radius and ulna on April 21, and by bilateral operations involving open reduction and fixation, including hardware, on April 25.
16. Plaintiff's laboratory studies at the time of admission indicated that she tested positive for ethanol at a concentration of 48 milligrams per deciliter. She was 5"1' tall and weighed approximately 105 pounds. While she did occasionally drink alcohol, she regularly consumed a drink about twice a month. Her status as a naïve drinker, her height and weight and *Page 7 
her blood alcohol content at the time of the accident was sufficient to cause a loss of inhibitory control, and to produce behavior that contributed to the occurrence of the accident.
17. The employer's first report of injury or illness, completed for Texas workers compensation, indicated that plaintiff was doing her regular job at the time of the injury. Defendant-employer or its claims administrator hired a rehabilitation nurse from Concentra, who completed reports and visited the hospital prior to the denial of the claim.
18. Following her discharge from Carolinas Medical Center, plaintiff was flown back to Texas in the owner's private jet. She returned to Presbyterian Hospital of Allen, Texas, on April 28, 2005, with complaints which included headache. She was transferred to Presbyterian Hospital of Dallas by helicopter. Studies were performed and she was seen by Jon Krumerman, M.D., a neurosurgeon. Dr. Krumerman felt that the headache was multifactorial, given the trauma and recent brain surgery. He arranged observation and referred her for follow up treatment.
19. Dr. Krumerman saw plaintiff again on May 26, 2005, and noted that she had made an excellent recovery. He reviewed her CAT scan and saw resolution of the bleeding, though he noted post operative changes. Plaintiff was able to walk ten miles per day in order to participate in a breast cancer race, and Dr. Krumerman allowed her to return to work part-time.
20. Dr. Rudolf Churner and Dr. Gerald B. Broussard, ophthalmologists, provided treatment for plaintiff on the injury. Dr. Broussard provided a prescription for lost contacts are plaintiff was in the hospital. Dr. Churner evaluated her vision and orbital fractures in May and June, 2005. *Page 8 
21. Plaintiff's broken teeth required extensive dental treatment. A. Tom Brian, D.D.S., treated eight (8) teeth for the effects of the injury with crowns: numbers 8, 9, 24, 25, 26, 23, 31, and 19.
22. Dr. Ewen Tseng, an otolaryngologist, saw plaintiff on June 7, 2005. Dr. Tseng found tinnitus, or ringing in her ears, and a nasal airway instruction, among other complaints. Dr. Tseng tested her hearing, which was found to be within normal limits. Plaintiff had also lost her sense of smell from the accident, and her sense of taste was compromised.
23. Plaintiff saw Vudhi Slabisak, M.D., an orthopedic surgeon, for follow up of her bilateral wrist fractures. Dr. Slabisak recommended physical therapy and treated plaintiff through September 26, 2005. At the conclusion of his treatment, on September 26, 2005, Dr. Slabisak referred plaintiff to Dr. Denton Watumull, a hand specialist.
24. Dr. Watumull saw plaintiff on September 27, 2005, and referred her to his partner, Dr. Oishi. On October 5, 2005, Dr. Oishi noted that plaintiff's left wrist was doing well but that her right wrist was more worrisome because of the position of the step off fracture. Dr. Oishi discussed the long-term prognosis, including the possible need for salvage surgery if the right wrist continues to hurt or worsen.
25. Plaintiff returned to Dr. Watumull for evaluation of her nasal fracture on October 13, 2005. Dr. Watumull found a nasal obstruction and ordered a study to address the previous nasal fracture and facial fracture anatomy. After a follow-up visit one October 24, 2005, Dr. Watumull performed a rhinoplasty with osteotomy and complex septoplasty on November 21, 2005. Plaintiff's breathing was improved following the surgery, and she was pleased with the appearance. *Page 9 
26. At the visit of August 22, 2005, Dr. Krumerman noted that plaintiff had nasal congestion attributed to a sinus problem and bilateral frontal lobe encephalomalacia. He she denied complaints of headache. However, by December 12, 2005, plaintiff's complaints of headache had returned. In addition, plaintiff had "become more aware of some of her cognitive difficulties, namely difficulty with some decision-making and multitasking." She had a loss of sense of smell related to her bifrontal injury. Dr. Krumerman referred plaintiff to a neurologist for her headaches and to a neuropsychologist for her cognitive difficulties.
27. Brian Joe, M.D., a neurologist, examined plaintiff on December 13, 2005. Plaintiff was experiencing problems with short-term memory, trouble focusing while driving, and processing speed problems. Plaintiff noted that she was having to re-read a page several times before grasping the information. Dr. Joe noted that plaintiff's clinical presentation was very good, but that she did show slow processing speed and had headaches. He suspected that her "attention and concentration will be impaired to some extent permanently." Dr. Joe agreed with neuropsychological testing.
28. Plaintiff's return to work at the dealership was very difficult. Although she had performed the job for many years, and had a degree in accounting, she was unable to use the calculator or a keyboard immediately following her return. She had episodes of crying. She managed her work day at the dealership by putting up post-it notes so she would not forget important tasks and covering up what she did not understand. She often did not remember things or made mistakes.
29. While plaintiff was out of work following the accident defendant-employer brought in two employees to perform her duties. Items were identified that needed improvement, and Farris Hamilton gave plaintiff 60 days to act upon them. Although she had returned on a *Page 10 
limited basis, plaintiff worked hard and was able to correct them or to put in a plan for correction. She had another review at the end of the period.
30. Plaintiff had a performance appraisal completed on February 16, 2006. The brief comments included that she "really do [sic] well on the tasks worked on" and that she "gets things done." Critical comments were that she was "a bit too abrasive/confrontational" and that she did too much. A subsequent manager's performance appraisal document from March 2006, completed by Dennis Donathan, indicated that she required some limited supervision or new or unusual tasks, that she had difficulty in decisions involving new or complex demands, and that long-term problems sometimes were managed as well as "short run" solutions. Plaintiff was consulted on the evaluation with Mr. Donathan.
31. Plaintiff underwent a neuropsychological evaluation on March 28, 2006, performed by Laura H. Lacritz, Ph.D. Dr. Lacritz noted that plaintiff did not believe she was as quick and sharp as she used to be, that she reported that it took longer to finish tasks and that things were not flowing as logically as in the past. Plaintiff also stated that she misremembered items and forgot what was said. Other problems were word finding difficulties, missed letters when typing, and decreased reading comprehension. She had confused north and south on one occasion and feared getting lost.
32. Plaintiff noted frustration with work-related problems which she did not associate with the accident. However, prior to the accident she reported that she did not forget anything, despite working 12 hour days. Following her post-accident return to work, she felt that she was slower, had more trouble keeping track of things, and was more reliant on written notes and e-mails. Dr. Lacritz performed extensive testing, including separate tests on intelligence, reading, *Page 11 
sorting, verbal fluency, memory, and verbal learning. Plaintiff demonstrated some difficulty during the testing, including mild word finding problems, and she became upset on one test.
33. The results of the testing and evaluation indicated that plaintiff had an average IQ, consistent with premorbid levels, but had difficulty on processing speed, visuoconstructional ability, and verbal abstraction. Dr. Lacritz found relative cognitive deficits in processing speed, language functioning and aspects of attention, suggesting an overall pattern of residual deficits from her traumatic brain injury. Dr. Lacritz felt that it would take plaintiff longer to complete certain tasks and that she would be vulnerable to becoming overwhelmed when having to process information quickly. Dr. Lacritz suggested several adaptations, including repeating information, making use of written notes and systematically organizing her tasks. Plaintiff was advised to tackle more complex tasks during the beginning of the day, to take more breaks and to allow herself to catch up on rest on her days off. Dr. Lacritz expected that the effects of the traumatic brain injury would be stable over time, but that processing speed and attention could improve.
34. Following an episode in May 2008 where plaintiff changed the pay for two office employees without authorization and issued a check without a required second signature, plaintiff was terminated from her employment. Her last day working for defendant-employer was May 15, 2006. The termination notice stated that she had poor performance and listed the two episodes. Plaintiff had failed to follow her usual procedure of obtaining a second signature because the money was for lunch and cash gifts for Secretaries Week, and she wanted the gifts to be a surprise. Although Mr. Donathan was available to sign the check, plaintiff became forgot to obtain the signature before cashing the check. Dennis Donathan, the comptroller, had known about the raise given to the employees and the check prior to either being issued; however, plaintiff was fired. *Page 12 
35. Plaintiff was out of work for four months following her termination. She received unemployment benefits in the amount of $5,600.00. After a job search, she found employment with RMC Credit Services supervising the administrative staff. Although plaintiff had to learn a new job, she is able to delegate tasks and to recognize her limitations. Plaintiff's earnings in her new employment have been reduced. From approximately September 15, 2006 through December 31, 2006, plaintiff earned $19,434.68, and she earned $73,004.35 in 2007. Using the 2007 figures, plaintiff's average weekly wage following the injury is $1403.25, yielding a wage loss of $597.29.
36. In addition to the complete loss of the sense of smell, plaintiff also has lost her sense of taste. She has numbness on her facial skin in her chin area. She has frequent headaches. She experiences pain in her wrists, right greater than left. Her eyes are not aligned as before, and her left eye droops when she is tired. Plaintiff has an indentation in the temple region on the left side of her face. She has a large scar in the center her forehead that is depressed at the hairline. She has a scar down through the right side of her lip from the bottom of her nose through the Cupid's bow area and into her that. Plaintiff has a craniotomy indentation. Notably, she does not look like herself as portrayed in pre-accident pictures.
37. The defendants termination of plaintiff did not amount to an unjustifiable refusal of suitable employment by the plaintiff. Plaintiff's disability resulted in her omissions at work, cumulating in her dismissal. Defendants did not treat plaintiff as a non-disabled employee.
38. Because of defendants termination of plaintiff, she experienced a period of temporary total disability. Plaintiff completed a reasonable job search and, due to her efforts, was able to find gainful, suitable employment based upon her age, education and other factors, and injuries to her brain and other body parts. *Page 13 
39. The plaintiff has proven that she was disabled and incurred a wage loss as a result of her multiple injuries and is entitled to receive benefits for wage loss for the remainder of the 300 week period following the injury.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. The Workers' Compensation Act should be liberally construed to effectuate its purpose to provide compensation for injured employees and its benefits should not be denied by technical, narrow and strict construction. The evidence tending to support the plaintiff's claim is to be viewed in the light most favorable to the plaintiff, and the plaintiff is entitled to the benefit of every reasonable inference to be drawn from the evidence. Adams v. AVX Corp.,349 N.C. 676, 509 SE 2d 411 (1990).
2. An injury is compensable as employment related if any reasonable relationship to employment exists. Holley v. Acts,Inc., 357 N.C. 228, 581 S.E.2d 750 (2003) Employees "whose work requires travel away from the employer's premises are within the course of their employment continuously during such travel, except as when there is a distinct departure for a personal errand." Ramsey v. S. Indus. Constructors, Inc.,178 N.C. App. 25, 30, 630 S.E.2d 681, 685-86 (2006). In addition, it is "well established that a travelling employee will be compensated under the Workers' Compensation Act for injuries received while returning to his hotel, while going to a restaurant or while returning to work after having made a detour for his own personal pleasure." Cauble v. Soft-Play, Inc.,124 N.C. App. 526, 528, 477 S.E. 2d 678, 679 (1996) *Page 14 
3. An employee injured in the course of his employment is disabled under the Act if the injury results in "incapacity . . . to earn the wages which the employee was receiving at the time of injury in the same or any other employment." N.C. Gen. Stat. § 97-2 (9) (2008). Accordingly, disability is defined in the Act as the impairment of the injured employee's earning capacity rather than physical disablement. People v. ConeMills Corp., 316 N.C. 426, 434, 342 S.E.2d 798, 804 (1986).
4. The burden is on the employee to show that she is unable to earn the same wages she had earned before the injury either in the same employment or in other employment. Hilliard v. Apex CabinetCo. 305 N.C. 593, 595, 290 S.E.2d 682, 684 (1982)
5. "Once the disability is proven there is the presumption that it continues until the employee returns to work at wages equal to those he was receiving at the time the injury occurred." Watkins v.Motor Lines, 279 N.C. 132, 137, 181 S.E.2d 588, 592 (1971)
6. Employee's own testimony regarding her limited ability to engage in work activity and her impairments and attention and memory is competent evidence of her abilities to work and relevant to the issues. Niple v. Seawell Realty Industrial Company,88 N.C. App. 136 (1987)
7. The plaintiff has proved her entitlement to continuing wage loss benefits. Defendants are responsible for additional benefits as will be determined by subsequent order.
8. The defendants are responsible for temporary total disability benefits as provided by N.C. Gen. Stat. § 97-29 for 5.5 weeks and 3 weeks, yielding a total of 8.5 weeks.
9. The defendants are responsible for continuing medical compensation as provided by N.C. Gen. Stat. § 97-25. *Page 15 
10. The defendants are responsible for payment for the permanent damage to plaintiff's eight (8) teeth.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. The defendants shall pay the plaintiff's temporary total disability benefits in the amount of $5,984.00.
2. The defendants shall pay the plaintiff's wage loss benefits in the amount of $398.39 per week beginning as of September 15, 2006 and continuing through December 31, 2007. Subsequent weekly payments will be made following the entry of an additional order.
3. The defendants will pay past and future medical expenses for the effects of plaintiff's injury.
4. The defendants shall pay for the permanent damage to plaintiff's eight (8) teeth at the amount of $210.00 per tooth.
5. Plaintiff's counsel is hereby awarded attorney fees in the amount of twenty-five percent (25%) of the total amount of compensation awarded to plaintiff above.
6. Defendants shall bear the costs.
 S/___________________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/___________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/___________________ DANNY LEE McDONALD COMMISSIONER *Page 1